# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| TEX-TECH INDUSTRIES, INC. on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARKANSAS BEST CORPORATION, AVERITT EXPRESS, CON-WAY, INC., FEDEX CORPORATION, JEVIC TRANSPORTATION, INC., SUN CAPITAL PARTNERS IV, LLC, NEW ENGLAND MOTOR FREIGHT, INC., OLD DOMINION FREIGHT LINE, INC., R+L CARRIERS, INC., SAIA, INC., UNITED PARCEL SERVICE, INC. and YRC WORLDWIDE INC.,<br><br>Defendants. | CIVIL ACTION NO._____<br><br>INJUNCTIVE RELIEF SOUGHT |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Tex-Tech Industries, Inc., on behalf of itself and all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants, demands a jury trial, and alleges as follows:

1.  From at least July 2003 to the present, Defendants conspired to fix "fuel surcharges" for 1ess-than-truckload shipments ("LTL"). LTL is defined as the service of providing freight shipment, for carriage by truck, when the freight to be shipped by a customer is less than one truckload.

2.  Plaintiff brings this action on behalf of itself and a class of persons, defined more fully herein, who paid a "fuel surcharge" on LTL services from July 2003 through the present.

1

1258364.1

3. Defendants' price-fixing conspiracy has directly and proximately caused injury to Plaintiff in its business and property. As a direct and proximate result of the unlawful agreement and activity alleged herein, Plaintiff paid higher prices for fuel than it otherwise would have paid.

4. Pursuant to Federal Rules of Civil Procedure 23(a), 23 (b), and 23(b)(3), Plaintiff seeks treble damages, injunctive relief, and attorneys' fees and costs under the antitrust laws of the United States.

5. This action is commenced pursuant to Sections 4 and 16 of the Clayton Act, 15 V.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by reason of the violations alleged in this Complaint.

6. This action is also commenced to obtain injunctive relief against Defendants and secure the prevention of further violations of Section 1 of the Sherman Act, as alleged herein.

## THE PARTIES

7. Plaintiff Tex-Tech Industries, Inc. ("Tex-Tech") is a Delaware corporation with its headquarters in Portland, Maine. Tex-Tech is a global manufacturer of high performance textiles. During the class period, Tex-Tech purchased LTL services during the Class Period directly from several of the Defendants and paid a collusively set and imposed "fuel surcharge."

8. Defendant Arkansas Best Corporation ("ABF") is a trucking conglomerate incorporated in Delaware offering LTL services under a variety of business names and wholly-owned alter-ego subsidiaries, including ABF, ABF Freight System, ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc. ABF's headquarters are at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

2

1258364.1

9. Defendant Averitt Express ("AE") is a privately held LTL company incorporated in Tennessee with most of its operations concentrated in the southeastern United States. AE's headquarters are located at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee 38502.

10. Defendant Con-Way, Inc. ("CW") provides LTL service, as well as truckload brokerage, airfreight forwarding, region asset based truckload service, transportation consulting, and assembly and distribution logistics programs for business-to-business supply cycle management. CW is incorporated in Delaware and has its headquarters at 2855 Campus Drive, Suite 300, San Mateo, California 94403.

11. Defendant FedEx Corporation ("FedEx") provides packaging, shipping, and freight services, including LTL services, and operates FedEx Kinkos, among other business lines. FedEx is a Delaware corporation with its principal place of business in Tennessee. FedEx's headquarters are located at 942 South Shady Grove Road, Memphis, Tennessee 38120.

12. Defendant Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation and major regional LTL services provider focusing on the Northeastern United States. Jevic's headquarters are located at 600-700 Creek Road, Delanco, New Jersey 08075.

13. Defendant Sun Capital Partners IV, LLC ("Sun") is a private equity fund incorporated in Delaware that purchases companies in leveraged buyouts. Sun purchased Defendant Jevic from Defendant Saia, Inc. on or about July 5, 2006, shares equitable ownership with Jevic, and as part of and subsequent to the leveraged buyout extracted so much equity from Jevic that the company currently does not have assets sufficient to pay the full claims of the Class. Sun's headquarters are located at 5200 Town Center Circle, Suite 470, Boca Raton, Florida 33486.

14. Defendant New England Motor Freight, Inc. ("NEMF") is a regional LTL

company incorporated in New Jersey, providing service in the Northeastern United States, Eastern Canada, and Puerto Rico. NEMF's headquarters are located at 1-71 North Avenue East, Elizabeth, New Jersey 07201.

15. Defendant Old Dominion Freight Line, Inc. ("ODFL") is a Virginia corporation that derives most of its business from LTL services. ODFL's headquarters are located at 500 Old Dominion Way, Thomasville, North Carolina 27360.

16. Defendant R+L Carriers, Inc. ("RLC") is a privately held LTL company, incorporated in Ohio, with operations in 45 states, Canada, and Puerto Rico. RLC operates under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount Transportation. RLC's headquarters are located at 600 Gillam Road Wilmington, Ohio 45177.

17. Defendant Saia, Inc. ("Saia") is an LTL company incorporated in Delaware with annual revenues exceeding $875 million. Saia's headquarters are located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097.

18. Defendant United Parcel Service, Inc. ("UPS") is a freight, package delivery, and supply chain management company incorporated in Delaware. UPS's headquarters are located at 55 Glendale Parkway, NE, Atlanta, Georgia 30328. UPS entered the LTL market by acquiring the assets of Overnite Transportation Company, then one of the largest LTL companies operating in the United States.

19. Defendant YRC Worldwide, Inc. ("YRC") is a large trucking company incorporated in Delaware providing LTL services and other freight services using its own name and several other brands. YRC's headquarters are located at 10990 Roe Avenue, Overland Park, Kansas 66211.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over this matter pursuant to 15 U.S.C. §§ 15

and 26 and 28 U.S.C. §§ 1331 and 1337.

21.     This Court also has diversity jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1332(d)(2) and (6) because one or more members of the putative class defined herein are citizens of a State different from one or more Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

22.     Venue is proper in this District pursuant to Section 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15,22, and 26) and 28 U.S.C. § 1391. Plaintiff resides in this District, and during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

23.     Defendants maintain offices, have agents, transact business, or are found within this Judicial District.

24.     This Court has personal jurisdiction over each of the Defendants because each Defendant transacted business in the United States, directly sold substantial quantities of LTL services throughout the United States as a whole, and/or was engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE RELEVANT GEOGRAPHIC AND SERVICE MARKET

25.     The relevant market in this Complaint is the market for LTL service for shipments wholly within North America and originating and/or terminating in the United States.  LTL shipments nearly always weigh between 300 and 10,000 pounds. Excluded from this market definition are the markets for shipments requiring at least one full truck, small package shipments, shipments of furniture and personal affects by persons moving from one house to another, intermodal shipments, and shipments for carriage by air,

water, or train.

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action as a class action on behalf of itself and all others similarly situated, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

The Class is defined as: All persons or entities who paid a "fuel surcharge" on LTL services directly to Defendants or their unnamed co-conspirators from September 5, 2003 through the conclusion of the trial in this matter and/or all persons or entities who purchased LTL services directly or indirectly from Defendants or their unnamed co-conspirators. Excluded from the Class are federal government entities, Defendants, their co-conspirators and their respective parent companies, subsidiaries, and affiliates.

27. "Person" means any individual, partnership, corporation, association, or other business or legal entity.

28. The Class Members consist of entities throughout the United States, making individual joinder impractical, in satisfaction of Federal Rule of Civil Procedure 23(a)(1). The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court.

29. Plaintiff believes Class Members number in the thousands, the exact number and identities being known only by Defendants.

30. The claims of Plaintiff are typical of the claims of the Class as required by Federal Rule of Civil Procedure 23(a)(3), in that Plaintiff paid for "fuel surcharges" on LTL services and/or purchased LTL services directly from Defendants.

31. There are questions of law and fact common to the Class. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof. The questions include but are not limited

6

to:

    a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize fuel surcharges imposed for LTL services;

    b.    The identity of participants in the conspiracy;

    c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

    d.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

    f.    The effect of Defendants' conspiracy on the prices of LTL services sold in the United States during the Class Period; and

    g.    The appropriate measure of damages sustained by Plaintiff and other members of the Class.

32.    Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiff has retained counsel with substantial experience in the prosecution of nationwide class actions. Plaintiff and its counsel are committed to the vigorous prosecution of this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor its counsel has any interest adverse to those of the Class.

33.    Plaintiff and members of the Class have suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication

1258364.1

of the controversy under Federal Rule of Civil Procedure 23(b)(3). Absent a class action, most members of the Class would likely find the cost of litigating their claims to be prohibitive, and would have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

## STATEMENT OF FACTS

34. Plaintiff and Class Members utilize LTL services to transport freight on the ground within North America. Based on various articles in trucking industry trade journals, Plaintiff estimates that the total domestic LTL industry revenue ranged from $25 to $35 billion annually during the Class Period.

### A. Inception and Operation of the Price-Fixing Conspiracy Among Competitors

35. LTL services are a commodity product that are fungible in the sense that LTL services provided by any one of the Defendants may be substituted for the LTL services provided by any other one of the Defendants. In essence, LTL services are homogeneous, fungible services sold by Defendants and purchased by Plaintiff and Class Members primarily on the basis of price.

36. The LTL service industry in the United States is highly concentrated, which facilitates coordination of prices. During the Class Period, Defendants possessed a combined United States market share exceeding 75%.

37. Entry into the LTL industry requires a considerable amount of time, resources, and industry knowledge. Practical entry into the industry is both expensive and risky, and requires several things, including: the purchase or lease of hundreds of trucks and dozens of truck depots; the control of a significant market share from existing

8

1258364.1

providers; the need for truck drivers in an already tight labor market; and significant advertising expenses in order to build a recognizable brand name.

38. Furthermore, even for potential shipping experts who possess the capital and know how to possibly enter the market, viable entry into the LTL market takes a considerable amount of time. When package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded already existing LTL companies rather than attempting to directly enter the market.

39. Unlike some other industries, LTL service providers cannot stock up on LTL services when prices are low, then use this stockpile when shipping prices are high.

40. The cartel members all sell as horizontal competitors at the retail level of distribution.

41. Price is the most important competitive factor in LTL shipping. The standardized nature of LTL shipping services hampers substantial and material non-price competition.

42. The firms that make up the LTL industry have a similar cost structure. There is a high ratio of fixed to variable costs. Capital equipment, software, advertising, depot purchase or lease, driver recruitment and training, and other capital costs are high relative to variable costs. None of the Defendants are greatly more efficient than the industry average.

43. The LTL industry is a mature industry, and is therefore characterized by slim profit margins, creating a motivation to collude. This is in stark contrast to newer industries, which are typically characterized by rapid growth, innovation, and high profits.

44. The LTL industry has a history of "cooperation."  For example, several regional LTL companies have formed alliances with other regional LTL companies

9

under the alleged purpose of offering nationwide services. In reality, however, these alliances include many more companies than would be required to offer such services. The amount of cooperation within the trucking industry is higher than in similar industries, and has essentially created a level of trust within the industry that has facilitated Defendants' collusion.

45.     The LTL industry has also become increasingly concentrated. For example, in 2003, Defendant YRC, then operating under the names Yellow Freight System and Yellow Transportation, merged with Roadway, then one of the larges LTL companies. The combined Yellow Roadway entity subsequently merged in 2005 with USF, another major LTL company, further increasing LTL market concentration.

46.     Defendants are able to match each others' prices by publishing their prices, and frequently using identical pricing software.

47.     When discussing mergers and sales of assets from one Defendant to another, Defendants exchange non-public competitively sensitive financial information, which occasionally allows them to audit and gauge their co-conspirators' compliance in imposing supra-competitive "fuel surcharges."

   **B.     Cost of Fuel for Trucking Operations**

48.     Fuel cost is the single substantial variable Defendants must cover that is subject to wide variation in price. When a company's variable costs increase, without an offsetting increase in demand, the profits of the company will decrease as the company can only pass on a portion of the cost increase to its customers.

49.     Beginning in 2003, Defendants faced drastically increased fuel costs and the likelihood of lower profits. As a result, Defendants collusively imposed on their customers what are claimed to be "fuel surcharges." In reality, however, these "fuel surcharges" bear little relation to the increase in Defendants' fuel costs. Higher fuel costs

were merely an opportunity for Defendants to agree amongst themselves to impose collusive "fuel surcharges."

50. Observers of the LTL industry, and even some Defendants, have noted the direct relationship between high fuel prices and LTL profits. By way of example:

a. A 2006 article in *Traffic World,* a weekly trade publication covering the transportation and logistics industry, quoted Ken Hazen, president of transportation software and freight payment firm CTSI, as describing fuel surcharges as " 'a profit center now ... Carriers are in control. They're in the catbird seat.' "

b. A 2005 article in *Fleet Owner,* a trade magazine for executives and managers of commercial trucking fleets, noted that in the past, increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices: "High diesel fuel prices usually signal harsh times for trucking ... That doesn't seem to be the case this year."

c. In its 2006 annual report, Defendant ODFL admitted that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability. "A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes."

d. Defendant YRC admitted in its 2006 annual report, "In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term."

e. Additionally, in its 2006 annual report, Defendant ABF noted that "as diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy related areas, operating margins could be negatively impacted."

11

51. These admissions are in striking contrast to the domestic passenger airline industry. For example, in its 2006 annual report, Southwest Airlines noted: "The cost of fuel, which was at a historically high level over the last two years, is largely unpredictable, and has a significant impact on the Company's results of operations ... Due to the competitive nature of the airline industry, the Company's ability to increase fares is limited."

52. In its 2006 annual report, United Airlines made a similar observation: "At times United has not been able to increase its fares when fuel prices have risen due to the highly competitive nature of the airline industry, and it may not be able to do so in the future ... "

53. On December 15, 2004, the *International Herald Tribune* published an article entitled, "Fuel Costs wipe out airline profit despite travel rebound," The article noted, "The airline industry is experiencing huge growth worldwide, in a recovery from several rough years after the September 11, 2001 terrorist attacks and regional problems like sever acute respiratory syndrome, or SARS. But the escalation in fuel prices produced another huge loss for the industry this year."

### C. How the Cartel Functioned

54. LTL companies began imposing increasingly high "fuel surcharges" when fuel prices began to increase in the early 2000s. These "fuel surcharges" were not established by rate-setting organizations, and are beyond the scope of their former limited antitrust immunity.

55. Defendants agreed to impose identical or nearly identical "fuel surcharges" by agreeing to tie the "fuel surcharges" to an index of diesel fuel prices published to the public by the United States Department of Energy ("Fuel Index"). Moreover, in order to communicate movement pricing and to police the cartel, each of

1258364.1

Defendants lists its fuel surcharges on their websites. As a result, Defendants' "fuel surcharges" move in lockstep, as illustrated in the following chart showing the fuel surcharges of each Defendant at different Fuel Index levels:

| Diesel Fuel $/Gallon | ABF | AE | CW | FedEx Freight | Jevic | ODFL | RLC | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9 | 18.9 | 19.0 | 18.5 | 18.9 | 18.9 | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9 | 20.9 | 20.9 | 21.0 | 20.5 | 20.9 | 20.9 | 20.9 | 20.9 |
| 3.20 | 22.9 | 22.9 | 22.9 | 21.9 | 23.0 | 22.5 | 21.9 | 22.9 | 22.9 | 22.9 |
| 3.40 | 24.9 | 24.9 | 24.9 | 22.9 | 25.0 | 24.5 | 22.9 | 24.9 | 24.9 | 24.9 |
| 3.60 | 26.9 | 26.9 | 26.9 | 23.9 | 27.0 | 26.5 | 23.9 | 26.9 | 26.9 | 26.9 |

56.     Recently, the Fuel Index was near $3.00. At that price, Defendants charged a "fuel surcharge" of 20.5%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, and 20.1 %.

57.     The amount of the "fuel surcharge" imposed by the LTL companies on shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the increase in fuel prices since the "fuel surcharge" was implemented.

58.     For example, when referring to its LTL service, FedEx Freight, Defendant FedEx noted, "While fuel costs increased substantially in 2006, fuel surcharges more than offset the effect of higher fuel costs ... " Likewise, Defendant CW has stated: "As fuel prices have risen, the fuel surcharge has increased Con-Way Freight's yields and revenue, and Con-Way Freight has more than recovered higher fuel costs and fuel-related increases in purchased transportation. "

D.     **Effects of the Unlawful Horizontal Agreement in Restraint of Trade**

59.     The unlawful contract, conspiracy, or combination alleged above had the

13

1258364.1

following effects:

    a.    Prices charged by Defendants and their co-conspirators to Plaintiff and Class Members for LTL services were maintained at artificially high and noncompetitive levels; and

    b.    Plaintiff and Class Members were required to pay more for LTL services than they would have paid in a competitive marketplace unregulated by Defendants' and their co-conspirators' collusive and unlawful price fixing.

60.    During and throughout the period of the contract, conspiracy, or combination alleged above, Plaintiff and Class Members directly purchased LTL services in the United States.

61.    Plaintiff and Class Members paid more for the LTL services than they would have paid under conditions of free and open competition.

62.    As a direct and proximate result of the illegal contract, conspiracy, or combination alleged above, Plaintiff and Class Members were injured and financially damaged in their business and property, in amounts that are not presently determinable, but in excess of the amount necessary for the jurisdiction of this court.

## INJUNCTIVE RELIEF

63.    Defendants' scheme to enter into an unlawful combination or conspiracy and reduce or eliminate competition creates an ongoing pattern of illegal conduct that will continue to cause Plaintiff and Class Members economic losses, as well as hamper competition in the relevant geographic and service market.

64.    A monetary judgment in this case will only compensate Plaintiff and Class Members for past losses. A monetary judgment will not restore competition.

65.    No individual customer of any Defendant has an adequate remedy at law.

1258364.1

## FIRST CAUSE OF ACTION
### Violation of 15 U.S.C. § 1

66. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

67. From at least September 5, 2003, and continuing through the present, Defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. § 1.

68. In furtherance of this unlawful combination and conspiracy, upon information and belief, each of Defendants and their co-conspirators have committed overt acts, including, *inter alia:*

    a. Agreeing to charge prices at certain levels and to otherwise fix, increase, maintain, and/or stabilize the prices of fuel surcharges of LTL services sold in the United States;

    b. Communicating with co-conspirators regarding the prices to be charged for LTL "fuel surcharge" services;

    c. Meeting with co-conspirators in order to keep the existence of the conspiracy unknown and foster the illegal anti-competitive conduct described in this Complaint; and

    d. Abstaining from competition by refusing to offer fuel surcharges and LTL services at prices below the agreed upon fixed price.

69. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise, and/or stabilize the prices of fuel surcharges on LTL services.

70. Defendants' anti-competitive agreement was implemented by, among other things, instituting surcharges calculated by reference to publicly published indices, These coordinated price increases continued on a regular basis, through the present, with

1258364.1

the actual and intended result that Plaintiff and Class Members pay supra-competitive prices for fuel surcharges on LTL services. Defendants erroneously attributed these price increases to the cost of fuel. As a direct and proximate result of the fuel surcharges on the LTL price fixing conspiracy, Defendants have restrained competition in the LTL market. This competitive restraint has injured Plaintiff and Class Members in their business and property by forcing them to pay a higher price for fuel surcharges on LTL services than they would have paid absent the unlawful conduct alleged herein.

71. The conduct of Defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

72. Alternatively, the conduct of Defendants and their co-conspirators is a rule of reason violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, given that there is no legitimate business or pro-competitive justification for the actions alleged herein.

### SECOND CAUSE OF ACTION
### Unjust Enrichment and Disgorgement of Profits

73. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

74. Defendants have been directly and unjustly enriched through overpayments by Plaintiff and Class Members, and the profits enjoyed by Defendants are a direct result of such overpayments.

75. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiff and Class Members.

76. Plaintiff seeks disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from with Plaintiff and Class Members may seek restitution.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that:

A.	The Court determines this action may be maintained as a class action under Federal Rule of Civil Procedure 23.

B.	The contract, combination or conspiracy, and the acts done in furtherance thereof, by Defendants and their co-conspirators be adjudged to have been in violation of Section 1 of the Sherman Antitrust Act, 15 V.S.C. § 1.

C.	Judgment be entered for Plaintiff and the Class against Defendants for three times the actual amount of damages sustained by Plaintiff and the Class as mandated by law, together with the costs of this action, including reasonable attorneys' fees.

D.	The Court award restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and

E.	Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

    a.	Continuing, maintaining, or renewing the contract, combination, or conspiracy alleged in this Complaint, engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and adopting or following any practice, plan, program, or device having a similar effect or purpose; and

    b.	Communicating or causing to be communicated to any other person engaged in the distribution or sale of any LTL product except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

      F.      Plaintiff and Class Members obtain such other relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: September 5, 2007                */s/* Gregory P. Hansel
_____
Gregory P. Hansel
PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000

Howard J. Sedran
LEVIN FISHBEIN SEDRAN
& BERMAN
320 Walnut Street, Ste. 500
Philadelphia, PA 19106
(215) 592-1500

Mary Jane Edelstein Fait
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
55 West Monroe Street, Suite 1111
Chicago, IL 60603
(312) 984-0000

Counsel for Tex-Tex Industries, Inc. and the Proposed Class

1258364.1